**Opinion issued November 21, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

## NO. 01-21-00712-CV

———————————

**EQUINOR ENERGY LP, Appellant**

**V.**

**LINDALE PIPELINE, LLC, Appellee**

---

**On Appeal from the 157th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-44547**

---

## MEMORANDUM OPINION

When Equinor Energy, LP's predecessor, Brigham Oil & Gas, LP, began developing oil and gas wells in the "Rough Rider" portion of North Dakota's Bakken Shale, the water needed for its operations was brought in by trucks and

stored in tanks. In 2011, Brigham entered into a contract with Lindale Pipeline, LLC for the construction and operation of a freshwater pipeline, which the parties understood would be a more efficient and cost-effective way for Lindale to supply water to Brigham and third parties. Through merger, sale, and assignment, Brigham became "Statoil," which later changed its name to Equinor. Around 2014, with a downturn in the oil and gas industry and the arrival of an even more cost-effective method of providing water for development and operation of wells, Equinor began buying water from other suppliers instead of buying water that Lindale could have delivered using the freshwater pipeline.

Lindale sued Equinor for breach of contract, and Equinor countersued for breach of contract. A jury determined that both parties had breached the contract in different ways. The jury found Lindale's damages were $27,144,404.50, and Equinor's damages were $3,583,863.26. The trial court rendered judgment on the verdict, awarding Lindale $23,560,541.20 plus pre- and post-judgment interest. Equinor appealed.

On appeal, Equinor first argues that the trial court erred by finding that a contested portion of the parties' contract was ambiguous and submitting its interpretation to the jury. Next, Equinor contends that there was no evidence to support the jury's finding of the amount of Lindale's damages. Finally, Equinor

asserts that the jury charge incorrectly permitted the jury to rely on an unreasonable interpretation of the contested portion of the contract.

We affirm.

## Background

### I. Behan and Anderson work in Texas providing water for oil and gas operations.

Dale Behan owned and operated International Western Company d/b/a Western Company of Texas ("Western") to provide water by pipeline to oil and gas wells for drilling, completion, and production. His stepson, Chris Anderson, worked with him. From 2000 to about 2008 or 2009, Western worked primarily in the Barnett Shale area in Texas.

### II. Western expands from Texas to North Dakota.

Anderson testified that in 2008 or 2009, Mitchell Brown, a lead fracking supervisor who had worked with Anderson and Behan in the Barnett Shale, contacted Behan and Anderson regarding work in North Dakota. At that time, Brown was working for Brigham as a drilling and completion supervisor using hydraulic fracturing on oil and gas wells. Brown sought assistance from Behan and Anderson with provision of water for Brigham's wells. Behan and Anderson moved Western's work to North Dakota.[1]

---

[1] In North Dakota, they operated under a Master Sales/Service Contract. This contract included the following disclaimer: "Nothing in this Contract shall be

3

Western identified a water source, obtained permits, and began supplying water to Brigham by trucks. Despite the lack of obligation, Western became the sole provider of water for Brigham's operations in the Rough Rider area. As Behan and Anderson learned about the inefficiencies of overland transfer of water in North Dakota's climate, they conceived an idea to build an underground water pipeline, as they had done in Texas while working in the Barnett Shale.

## III. Behan and Anderson have a big idea.

In 2010, Behan and Anderson approached Brigham's Russell Rankin with their idea, which was novel or "revolutionary" for the time and location. Behan then met with Rankin and others at Brigham's office in Austin, Texas, and they learned that Brigham planned to install a gathering system for its Rough Rider project. Rankin told Behan that Brigham planned to truck in water for its operations, and Behan suggested that Brigham modify its right-of-way agreements to allow the construction of an underground freshwater pipeline beneath the pipes needed for the oil-and-gas gathering system.

Both Behan and Brigham wanted to own the freshwater pipeline. Behan testified that in exchange for pipeline ownership, Brigham promised Behan that it would buy "all the water necessary to frac every well in the Rough Rider project."

---

construed to obligate Operator [Brigham] to order work, equipment or materials from Provider [Western], or to obligate Provider [Western] to accept work from or furnish equipment or materials to Operator [Brigham]."

Behan said that, at the time, Brigham "anticipated over the next ten years, they would frac between 450 and 500 wells." Behan testified that Rankin said Behan's company would make over $50 million if Behan made the deal with Brigham. Behan recalled that Rankin said: "Dale . . . instead of building your own pipeline, if you will do this deal with us, you will have the best 401(k) of any individual in the total United States." Behan testified that he was persuaded to make the deal with Brigham, so they hired attorneys and negotiated the details over a period of eight months.

## IV.     The parties sign the Pipeline Agreement.

On June 10, 2011, Behan and Lance Langford, Brigham's executive vice-president, signed the Pipeline Agreement. Behan, his wife Linda, and Anderson formed Lindale Pipeline, LLC to conduct the operations under the Pipeline Agreement, rather than operating as Western. The Pipeline Agreement included the following provisions relevant to this appeal:[2]

---

[2]     The Pipeline Agreement also included the following terms:

5.      Indemnity

. . . .

G.      Consequential Damages

Notwithstanding the provisions of Section 5 (A) through (D) above, neither Party shall indemnify or hold the other liable for its consequential, indirect, or special damages. This shall include without limitation, loss of profit, loss

of or inability to use property and equipment or business interruption, howsoever same may be caused.

. . . .

11.     Term and Termination

This Agreement shall be effective as of February 1, 2011 and will remain in effect for ten (10) years. In the event of a material change of the economic conditions related to the operation of the Pipeline, this Agreement may be terminated by either Party upon thirty (30) days written notice to the other Party. This Agreement may be terminated by mutual written consent of both Parties at any time. Notwithstanding the above, if Lindale breaches any material provision hereunder, Brigham shall have the right to immediately terminate the Agreement.

. . . .

13.     Miscellaneous

. . . .

A.      Waiver

No waiver by either Party of any default by the other Party for the performance of any provision, condition or requirement herein shall be deemed to be a waiver of, or in any manner release the other Party from, performance of any other provision, condition or requirement herein, nor deemed to be a waiver of, or in any manner release the other Party from, future performance of the same provision, condition or requirement; nor shall any delay or omission of either Party to exercise any right hereunder in any manner impair the exercise of any such right or any like right accruing to it thereafter.

B.      Modification

This Agreement may not be modified, varied or amended except by an instrument in writing signed by the Parties.

. . . .

E.      Entire Agreement

This Agreement constitutes the sole and complete agreement of the Parties and supersedes all other agreements or representations of any kind, oral or

Pursuant to discussions between Brigham Oil & Gas, L.P (hereinafter "Brigham") and Lindale Pipeline, LLC (hereinafter "Lindale") (collectively referred to herein as the "Parties" and individually as a "Party"), the following terms have been agreed to with regard to the "North Dakota Rough Rider" freshwater pipeline project (the "Pipeline") and the installation, repayment, operation and use thereof. The Pipeline shall mean the (i) the 12" freshwater pipeline, lateral lines, related facilities, well-site appurtenances, rights-of-way, easements, and permits owned by Brigham as of the date of this Agreement, including without limitation, those described and shown on <u>Exhibit A</u> attached hereto, and (ii) any extension, expansion, addition, or enhancement thereto hereafter acquired by either Party. The terms of the Agreement are as follows:

. . . .

1.      <u>Operation of Pipeline</u>

       A.      Brigham has acquired right-of-way and constructed the Pipeline to provide water for drilling, completion and production operations at a cost of approximately $13,500,000.00. Except as otherwise provided herein, Brigham hereby grants Lindale the exclusive right to operate and maintain the Pipeline in order to provide water for drilling, completion and production operations.

. . . .

3.      <u>Transportation and Gathering Charges</u>

. . . .

The Parties agree that any additional overland transfer charges associated with the delivery of water from the termination of the

---

otherwise, not included herein. The pre-printed terms and conditions of any invoice or other document issued by Lindale in connection with this Agreement which are in addition to or inconsistent with the terms of this Agreement shall not be binding upon Brigham and shall not be deemed to modify this Agreement.

underground pipeline or underground lateral lines for frac[k]ing operations shall be paid to the third party transfer company providing said service at standard rates agreed to between Brigham and the transfer company providing the overland transfer service; provided, however, no additional overland transfer charges shall be incurred for connections of 500 feet or less from the applicable Brigham well. Lindale shall provide to Brigham under separate cover a written breakdown of current pricing for said third party overland transfer services as quoted by [Western].

4.     Pipeline Priority & Excess Capacity

All Brigham projects shall have first priority for water delivered through the Pipeline; however, Lindale shall have the right to access and use the Pipeline's excess capacity to provide water for other purposes or projects so long as such access and use does not interfere with access and use of the Pipeline for Brigham purposes.

. . . .

Lindale shall be the sole and exclusive water provider and pumper on the Pipeline; however, in the unlikely event that Lindale is unable to provide water through the Pipeline for Brigham, Brigham may then use other water sources or pumpers on the Pipeline.

. . . .

## V.     Lindale supplies all the water needs for Rough Rider wells until about 2014.

For about three years after the execution of the Pipeline Agreement, Lindale was the exclusive provider of water for Brigham's wells on the pipeline. In 2014, Equinor began purchasing water from other suppliers.[3] By 2014 or 2015, some operating parameters had changed from the time when Anderson and Behan were

---

[3]     By 2014, Statoil had purchased Brigham, and it later changed its name to Equinor. For convenience and because there is no dispute about corporate ownership of the appellant, we refer to Brigham's successor as "Equinor."

8

first invited to provide services in North Dakota. One, more water providers had entered the North Dakota market, and they provided a more cost-effective method of supplying water by using lay-flat hoses. Two, the demand for water for fracking each well had also increased significantly. And three, some of Equinor's employees, contractors, and supervisors were new and lacked the institutional history about relationships among Brigham, Western, and Lindale.

From 2014 to 2016, Equinor purchased water from Lindale (from the pipeline) at the contractually discounted price for its production operations, but Equinor did not purchase water from Lindale for drilling, fracking, or completion activities.[4] Other disputes arose between the parties. While Lindale believed that Equinor had breached the Pipeline Agreement by purchasing fracking water from others, Equinor believed that Lindale had breached the Pipeline Agreement by failing to pay Equinor fees for water that traveled through the pipeline for sale to third parties. Equinor also believed that Lindale breached the Pipeline Agreement by failing to pay for pipeline repairs. To resolve some of the parties' disputes, from 2017 to 2018, Lindale temporarily gave Equinor an additional discount beyond the contract price for water used in fracking operations.

---

[4]     In 2015, Lindale and Equinor signed an amendment to the Pipeline Agreement that altered the some of the pricing terms but did not affect the exclusivity terms that the parties dispute on appeal.

## VI.    Lindale files suit, and Equinor countersues.

In June 2019, Lindale sued Equinor for breach of contract and other causes of action that were not submitted to the jury at trial. The following year, Equinor informed Lindale that it intended to let the Pipeline Agreement expire in 2021. Lindale then sent Equinor a 30-day termination notice. Equinor later countersued Lindale for breach of contract regarding the payment of fees for water that traveled through the pipeline before sale to third parties and for repair costs.

## VII.   The parties argue about the ambiguity of the exclusivity provision.

In February 2020, Equinor moved for partial summary judgment seeking a ruling that the exclusivity provision in section 4 of the Pipeline Agreement was unambiguous and did not obligate Equinor to obtain all needed water from Lindale. Lindale responded and sought partial summary judgment. Lindale also argued that the exclusivity provision was unambiguous, but it argued that the Pipeline Agreement obligated Equinor to obtain all needed water for its Rough Rider operations from Lindale unless Lindale was unable to provide the water.

The trial court denied the motion for summary judgment and provided the parties with an explanation:

> Pending on today's submission docket is Defendant's Motion for Summary Judgment. The Court reviewed that Motion, the Plaintiff's Response, the relevant evidence, the disputed contract language, and applicable case law and determined that the motion should be denied at this time: but, not exactly for the reasons argued by the Plaintiff.

The Court is having difficulty wrestling with the interpretations put forth by both the Plaintiff and the Defendant of the alleged exclusivity provision found in Section 4 of the Agreement. As such, the Court is curious if additional evidence will be of assistance. Recognizing that extrinsic evidence is not admissible to construe an unambiguous contract, nor can it be used to create an ambiguity where it doesn't otherwise exist, there are still objective facts that the Court can consider. *See Barrow-Shaver Res. Co. v. Carrizo*, 590 S.W.3d 471 (Tex. 2019). These facts include things such as setting, context, surrounding circumstances, and industry custom and usage. Alternatively, if such evidence will not assist the Court, then it is the Court's belief that the provision is, in fact, ambiguous. Nonetheless, it is premature to make that legal conclusion without first allowing the parties to brief, argue, and file evidence that they believe can be considered.

The trial court ordered the parties to establish an agreed briefing schedule to submit additional briefing and evidence responsive to the trial court's stated concerns. In response, the parties informed the court of the need for additional discovery and asked the court to defer ruling on the cross-motions for summary judgment.

In April 2021, Equinor filed an amended motion for partial summary judgment. In its motion, Equinor argued that the Pipeline Agreement was unambiguously clear. Referring to section 4 of the Pipeline Agreement, Equinor argued that the agreement granted Lindale an exclusive right to transport water through the Pipeline but it did not obligate Equinor to buy or use any water from

the pipeline. Instead Equinor maintained that it had an option to buy water that Lindale transported through the pipeline or to use non-pipeline water.[5]

In response, Lindale argued that, considering the entire agreement, the Pipeline Agreement unambiguously provided that Lindale was the sole and exclusive water provider for Brigham's (and later Statoil/Equinor's) wells on the pipeline. Lindale argued in the alternative that the Pipeline Agreement was ambiguous and created a question of fact for the jury.

## VIII. A jury finds that both Lindale and Equinor breached the contract.

The case was tried to a jury on the competing breach-of-contract claims. By the time the parties went to trial, Lindale's claims had been narrowed by the trial court's grant of partial summary judgment on limitations, and Lindale proceeded to seek breach-of-contract damages as to 94 wells that Equinor fracked with water provided by a third party since June 28, 2015.

---

[5] In the summary of its argument, Equinor makes the following arguments:

- [T]he Pipeline Agreement does not require Equinor to buy all the water it needs from the Pipeline . . . .
- [The] agreement was an option contract.
- Equinor had the right to use as much or as little water from the Pipeline as it chose.
- Equinor was free to obtain water from other sources such as tanker trucks.
- [The Pipeline Agreement only] grants Lindale the exclusive right to transport water through the Pipeline.
- [The Pipeline Agreement] imposes no obligation on Equinor to obtain all of its water from the Pipeline.
- Equinor is not obligated to buy water exclusively from the Pipeline.

At trial, Behan and Anderson testified about their course of dealings with Brigham, and later Statoil and Equinor. They testified about the inception of the pipeline project, the negotiation of the pipeline agreement, and their understanding of the exclusive nature of the agreement between Lindale and Brigham. Behan and Anderson maintained that Brigham complied with the agreement by purchasing water for drilling, completion, and production from Lindale until Statoil bought Brigham, and that breaches of the agreement began around 2014.

Mitchell Brown, Brigham's "boots-on-the-ground" supervisor in North Dakota, testified about his understanding of the exclusive nature of the agreement between Lindale and Brigham:

> As far as supplying water in the Rough Rider project, it was for them to supply all the water for the frac jobs and maintenance work as long as it was able to do that, as long as they were able to do that. But was exclusive, I mean, I—you know, exclusive as long as they could do that.
> And if they couldn't supply—now, this is my understanding. If they couldn't supply enough volume—let's say we were pumping, for ease of calculations, we were pumping 100 barrels a minute and they could only supply 50. Then that other lack of water, that other 50 barrels, would have been—it would have had to have been supplied by someone else.

Robert Howton, a long-time employee of Western and Lindale, testified that he was responsible for running the operations in the field. He worked first for Western, starting in 2011, and then for Lindale for the Rough Rider freshwater pipeline through the end of November 2020. He testified about the work he did for

Lindale. He explained that North Dakota required operators to report how much water was used in hydraulic fracturing through a reporting service called FracFocus.[6] Howton said that the information in FracFocus could be used to determine how much water Lindale would have provided to Equinor on the 94 wells in question. Howton testified that all 94 wells for which Lindale sought damages were on the pipeline, that Lindale did not provide the water for drilling or completion, and that Lindale could have provided the water needed for those jobs.

Howton testified about costs that Lindale would have incurred if it had provided water to the 94 wells at issue. He testified about manpower and said that Lindale would not have needed to hire additional staff because it could have accomplished all the tasks with its five employees, assuming limited amounts of overtime for each. Howton testified about how many days each job took at each of the 94 wells, how many diesel pumps Lindale would have needed, how much diesel fuel would have been required for the pumps (based on a usage rate of 11 gallons per hour for 24 hours each day of each job), and diesel fuel prices in each year from 2015 to 2019. Howton also explained how these numbers, plus the contractual sales price of water, could be used to calculate the amount of money—less costs—that Lindale could have earned if Equinor had allowed Lindale to provide water for the 94 jobs.

---

[6] FracFocus is the "national hydraulic fracturing chemical disclosure registry." *See* https://fracfocus.org/ (last visited October 26, 2023).

Behan, likewise, testified that he could determine the exact number of barrels of water used to frac the 94 wells at issue in this case because, although Lindale did not provide the water, the third parties who did provide the water reported that information using FracFocus. He testified that Lindale's damages could be calculated by multiplying the number of barrels of water by the contract price ($1.70) and deducting expenses. Behan agreed with Howton's testimony about manpower, pumps, and diesel that would have been needed for the 94 wells, although he thought Howton may have overestimated the cost of diesel. Behan also noted that Howton had not accounted for the cost of the water, which was 15 cents per barrel based on Lindale's contract with its supplier, and should be subtracted from any revenue to properly represent the value of Lindale's lost opportunity. Behan said that that the evidence of costs, total barrels of water used at the 94 wells, and the contract prices of the water could be used to calculate Lindale's lost profits.

In addition to the testimony, both Lindale and Equinor introduced voluminous documentary evidence. For example, Lindale introduced a summary showing the dates of fracking and the barrels of water used on the 94 wells that Equinor or Statoil fracked without using Lindale as the water provider. Equinor introduced a summary showing both Lindale's revenues from pipeline sales to Brigham and Equinor and its pipeline sales to third parties from 2011 to 2020.

Equinor also introduced more than 30,000 pages of evidence consisting primarily of invoices, meter readings, and detailed financial records showing Lindale's labor costs, and other operational records.

In closing argument, Lindale's counsel reviewed the evidence relating to the profits that it failed to realize as a result of Equinor's alleged breach of the agreement and argued to the jury how to calculate a damages award based on the evidence introduced at trial. The jury found that Equinor breached the Pipeline Agreement and assessed Lindale's damages in the amount of $27,144,404.50. The trial court entered judgment on the verdict, and Equinor appealed.

## Analysis

### I.     The court did not err by submitting the contract questions to the jury.

In its first issue, Equinor argues that the trial court erred by concluding that the contract was ambiguous and submitting to the jury a question that required it to determine the meaning of the contract. In its third issue, Equinor argues that the trial court erred by permitting the jury to consider unreasonable interpretations of the contract.

#### A.     Equinor preserved error on its first and third issues.

Both of these issues were preserved at trial. *Browder v. Moree*, 659 S.W.3d 421, 423 (Tex. 2022) ("A party preserves error by a timely request that makes clear—by words or context—the grounds for the request and by obtaining a ruling

on that request, whether express or implicit."); *accord Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 919–20 (Tex. 2015) (relying in part on pre- and post-trial motions to demonstrate preservation); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) ("There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling."); *see also* Reporter's Record Vol. 11, pp. 165–69. We consider these related issues together.

## B.    We review de novo whether the contract is ambiguous.

Ordinarily we review a complaint about charge error for an abuse of discretion. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016). But whether a contract is ambiguous is a question of law that we review de novo. *See Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021) (stating that de novo review is used); *First Bank v. Brumitt*, 519 S.W.3d 95, 105 (Tex. 2017) (stating that ambiguity is question of law).

In construing a contract, our goal is to ascertain the true intentions of the parties as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). In doing so, "we must examine and consider the entire writing in an effort to harmonize and give

17

effect to all the provisions of the contract so that none will be rendered meaningless." *Italian Cowboy Partners*, 341 S.W.3d 333. We do not read any provision in isolation but consider each provision with reference to the whole. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

"We begin this analysis with the contract's express language." *Italian Cowboy Partners*, 341 S.W.3d 333. In interpreting a contract, we give undefined words their plain, ordinary, and generally accepted meanings absent some indication of a different intent. *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23 (Tex. 2016). We also construe the words used in the contract "in the context in which they are used." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018). Whether a contract is unambiguous "depends on the language of the contract itself, construed in light of the surrounding circumstances." *First Bank*, 519 S.W.3d at 109–10; *see e.g.*, *Luling Oil & Gas Co. v. Humble Oil & Ref. Co.*, 191 S.W.2d 716, 724 (Tex. 1946) (holding that oil-and-gas contract "must be construed in connection with the rules and the customs of the industry to which the contract relates"). We must view contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper." *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 804–05 (Tex. 2023)

18

(quoting *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020)).

If, after applying these rules and principles of contract construction, the contract is subject to more than one reasonable interpretation, then we will conclude it is ambiguous. *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). If the contract's language can be given only one definite legal meaning or interpretation, then it is not ambiguous, and we will construe the contract as a matter of law. *See El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012) (citing *Italian Cowboy Partners*, 341 S.W.3d at 333). "[A] trial court errs when it submits an unambiguous contract to the jury rather than construing it as a matter of law." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 480 (Tex. 2019). "The error is harmless, however, if the jury found as the trial court should have found." *Id.*

### C. The trial court did not reversibly err by submitting interpretation of the contract to the jury.

Equinor argues that the Pipeline Agreement unambiguously gave Lindale only the right to be the sole and exclusive water provider and pumper on the pipeline but not the exclusive provider of water to Equinor's wells. Equinor relies on the first part of the first sentence of the second paragraph of section 4, the

definition of "pipeline," and article 1's expression of purpose, and first part of the first sentence of the first paragraph of section 4:

- "Lindale shall be the sole and exclusive water provider and pumper on the Pipeline . . . ."

- "The Pipeline shall mean the (i) the 12" freshwater pipeline, lateral lines, related facilities, well-site appurtenances, rights-of-way, easements, and permits owned by Brigham as of the date of this Agreement, including without limitation, those described and shown on Exhibit A attached hereto, and (ii) any extension, expansion, addition, or enhancement thereto hereafter acquired by either Party."

- "Except as otherwise provided herein, Brigham hereby grants Lindale the exclusive right to operate and maintain the Pipeline in order to provide water for drilling, completion and production operations."

- "All Brigham projects shall have first priority for water delivered through the Pipeline; however, Lindale shall have the right to access and use the Pipeline's excess capacity to provide water for other purposes or projects . . . ."

Relying on these parts of the Pipeline Agreement, Equinor argues that the Pipeline Agreement never mentions "wells," did not require Brigham or Equinor to buy water only from Lindale, and gave Lindale the valuable right to sell water to third parties and the exclusive right to "operate" the pipeline.

This interpretation does not give effect to all the relevant principles of contract interpretation. First, the selected portions of the Pipeline Agreement on which Equinor relies omit language that is relevant to construction of the contract. For example, the second paragraph of section 4 states:

20

> Lindale shall be the sole and exclusive water provider and pumper on the Pipeline; however, in the unlikely event that Lindale is unable to provide water through the Pipeline for Brigham, Brigham may then use other water sources or pumpers on the Pipeline.

The omitted language indicates that Lindale's inability to supply water to Brigham is "unlikely," and it makes an exception permitting Brigham to use other water sources or pumpers on the pipeline. This language favors a construction in which Lindale is the exclusive provider of water for Brigham on the pipeline.

Second, while Equinor quotes the language defining the pipeline, it does not give effect to the accompanying Exhibit A, which is a map showing where the pipeline existed and was planned, depending in part on "well-site appurtenances," in Williams County, North Dakota. It also showed existing wells on the pipeline. pipeline, lateral lines, related facilities, well-site appurtenances, rights of way, easements of the Williams County, North Dakota. In other words, it showed a freshwater pipeline running along the area where wells existed and were planned.

Third, Equinor argues that the Pipeline Agreement expressly states that Lindale has the "exclusive right to operate and maintain the Pipeline in order to provide water for drilling, completion and production operations," but it does not mention anything about wells. We disagree with that conclusion. Reading this contract in the utilitarian context of the business within which this agreement was made, we cannot ignore that the words "drilling, completion, and production operations" refer to activities related to oil and gas wells.

21

Fourth, and finally, Equinor argues that the Pipeline Agreement gave Lindale the valuable right to access and use the pipeline to sell water to third parties. Again, absent from Equinor's analysis is relevant language that helps to inform the intent of the parties. The first sentence of the first paragraph of section 4 states, in its entirety:

> All Brigham projects shall have first priority for water delivered through the Pipeline; however, Lindale shall have the right to access and use the Pipeline's excess capacity to provide water for other purposes or projects so long as such access and use does not interfere with access and use of the Pipeline for Brigham purposes.

Considering this language in the context of the entire Pipeline Agreement, we conclude that a reasonable interpretation of the Pipeline Agreement is that Brigham and Lindale intended for Lindale to provide water for drilling, completion, and production from Brigham's wells on the pipeline.

Whether we conclude as a matter of law that the Pipeline Agreement was unambiguous or that the trial court properly submitted the ambiguity to the trial court is not relevant in this case, because the jury's verdict indicates that it, too, reached the same conclusion about the meaning of the contract. Thus, the error, if any, of submitting an unambiguous contract to the jury was harmless. *See Barrow-Shaver*, 590 S.W.3d at 480.

In addition, in its third issue, Equinor argues that the trial court erred by permitting the jury to consider three possible interpretations of the Pipeline

22

Agreement propounded by Lindale. Equinor asserted that none of these interpretations was reasonable and that it was impossible to determine from the jury's verdict whether the jury relied on an invalid interpretation. Specifically, Equinor identified the three theories as being that Lindale had the exclusive right to provide water to wells that were (1) physically connected to the pipeline, (2) in close proximity to the pipeline, and (3) part of the Rough Rider project, without regard to proximity to the pipeline.

All the wells for which Lindale sought damages were fracked after June 2015, and the evidence at trial was that all the wells fracked in 2015 and later were "on the pipeline." Thus, considering the evidence presented at trial, two of the three alleged Lindale theories were irrelevant.

In light of this analysis, we overrule Equinor's first and third issues.

## II.   The evidence is legally sufficient to support the damages award.

In its second issue, Equinor argues that the evidence was not legally sufficient to support the damages award. Equinor asserts that (1) Lindale asked the jury to award lost profits but the jury charge instructed the jury to consider only a different measure of damages, (2) lost profits are contractually barred by the Pipeline Agreement, (3) market damages, not lost profits, is the sole correct measure of damages in this case, and (4) Lindale's lost profits argument fails to account for Lindale's costs thus erroneously inflating damages.

23

**A.     Lost profits as direct damages are not barred by the Pipeline Agreement.**

Equinor asserts that the Pipeline Agreement bars recovery of lost profits in this case, saying: "The parties expressly contracted around the difficulty of estimating a fictional profit margin on frack jobs that Lindale did not do. '[W]ithout limitation,' they waived 'loss of profit . . . , however same may be caused.'" The flaw in Equinor's argument is that it has taken the words out of context. The Pipeline Agreement actually states:

> G.     <u>Consequential Damages.</u>
>
> Notwithstanding the provisions of Section 5(A) through (D) above, neither Party shall indemnify or hold the other liable for its consequential, indirect, or special damages. This shall include without limitation, loss of profit, loss of or inability to use property and equipment or business interruption, howsoever same may be caused.

Rather than providing that the parties have waived lost profits "without limitation," this provision first identifies what is waived in broader, more general terms. It says that the parties will not indemnify each other for "consequential, indirect, or special damages." The next sentence begins with the word, "This," a pronoun that acts as the subject of the sentence. The antecedent to the pronoun "this" in paragraph G is "consequential, indirect, or special damages," not direct damages from breach of contract, which is what Lindale sought to recover at trial. *See Tabe v. Tex. Inpatient Consultants, LLLP*, 555 S.W.3d 382, 386 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("Unless the contract states otherwise, we

give words and phrases their generally-accepted meaning, reading them in light of the surrounding circumstances and the rules of grammar and common usage."). Accordingly, we conclude that this is not a reason to overturn the damages award.

**B.      Equinor waived its argument that market damages are the only proper measure of damages in this case.**

Equinor also argues that Lindale could only recover "market damages," not lost profits or any other type of damages for the loss the jury believed Lindale incurred in this case. To preserve error, a party must make the trial court aware of its complaint, timely and plainly, and obtain a ruling. *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003). Where the party has failed to do so, the complaint is waived. TEX. R. APP. P. 33.1(a)(1) (preservation of error); *see* TEX. R. CIV. P. 274 ("A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections."). To preserve error for appeal, a defendant who disagrees with the measure of damages in the jury charge must object to the charge and make the trial court aware of its complaint. *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007) (*citing Payne*, 838 S.W.2d at 241). Equinor did not object to the damages instruction at trial or in any way make the court aware that it believed the damages instruction was erroneous. Accordingly, we conclude that Equinor has waived this argument.

## C.      The damages award is supported by legally sufficient evidence.

Equinor argues that there is no evidence of the existence or amount of damages. It characterizes Lindale's damages as lost profits and then argues that no evidence, including evidence of lost profits, supports the question anwered by the jury in light of the jury instructions. To augment this argument, Equinor argues that Lindale's lost profits analysis failed to account for costs that would have reduced the jury award. Therefore, it reasons that the evidence of lost profits is not reasonably certain.

### 1.      Legal sufficiency standard of review

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding. *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014). "In reviewing a verdict for legal sufficiency, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We will sustain a legal sufficiency challenge if the record shows that: (1) there is a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact

is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Suberu*, 216 S.W.3d at 793 (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

### 2. Jury questions and instructions

Question 1 of the jury charge asked about breach of contract, and Question 3 asked about damages from the breach of contract found in Question 1.

### Question 1

Did Equinor fail to comply with the second paragraph of Section 4 of the Pipeline Agreement?

> It is your duty to interpret the following language of the second paragraph of section 4 of the Pipeline Agreement:

> > Lindale shall be the sole and exclusive water provider and pumper on the Pipeline; however, in the unlikely event that Lindale is unable to provide water through the Pipeline for Brigham, Brigham may then use other water sources or pumpers on the Pipeline.

> [Instructions regarding mutual intent of the parties and contract interpretation omitted]

. . . .

### Question 3

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Lindale for its damages, if any, that resulted from the failure to comply found by you in Question 1 that occurred on or after June 28, 2015?

Consider the following element of damages, if any, and none other,

> The difference, if any, between the value of the Pipeline Agreement as agreed to by the parties and the value of the Pipeline Agreement as received by Lindale.

While Equinor argues that this measure of damages cannot be supported by evidence of revenues, expenses, and lost profits, Lindale argues that this is a proper benefit-of-the-bargain instruction. We agree with Lindale.

### 3. Benefit of the bargain damages

"The general rule for measuring benefit of the bargain damages is to calculate the difference between what was promised and what was received." *MSW Corpus Christi Landfill, Ltd. v. Gulley-Hurst, L.L.C.*, 664 S.W.3d 102, 106–07 (Tex. 2023); *see Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) ("Benefit-of-the-bargain damages, which derive from an expectancy theory, evaluate the difference between the value that was represented and the value actually received."); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998) ("[T]he benefit-of-the-bargain measure computes the difference between the value as represented and the value received."). "The purpose of benefit of the bargain damages is to place the seller 'in the same economic position he would have been in had the contract been performed.'" *MSW Corpus Christi Landfill*, 664 S.W.3d at 106–07 (quoting *Barry v. Jackson*, 309 S.W.3d 135, 140 (Tex. App.—Austin 2010, no pet.)); *see Bowen v.*

28

*Robinson*, 227 S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (noting general rule that complaining party entitled to recover amount necessary to restore him to as good position as if contract had been performed).

A party "generally should be awarded neither less nor more than his actual damages." *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952). Lost profits are damages for the reasonably certain loss of net income to a business. *E.g.*, *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002). Benefit-of-the-bargain damages may include lost profits "that would have been made if the bargain had been performed as promised." *Formosa Plastics*, 960 S.W.2d at 50. To recover lost profits in this circumstance, the evidence must demonstrate that "the loss of profits was a material and probable consequence of the breach complained of and the amount due [can be] shown with sufficient certainty." *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). To show the amount of lost profits with sufficient or reasonable certainty, a party may rely on testimony from either an expert or the property owner, and the party must provide objective facts and data that support the amount of lost profits sought. *See Bowen*, 227 S.W.3d at 97.

### 4. Damages instructions in this case

Question 3 in the jury charge in this case asked for the difference in value of the Pipeline Agreement between what the parties agreed to and what Lindale

received. This is a measure of benefit of the bargain damages. *See MSW Corpus Christi Landfill*, 664 S.W.3d at 106–07; *Sonnichsen*, 221 S.W.3d at 636; *Formosa Plastics Corp.*, 960 S.W.2d at 49.

### 5. Lindale's lost benefit-of-the bargain

Under the Pipeline Agreement, Lindale expected to provide water to all of Equinor's wells on the pipeline for drilling, completion, and production. By answering "yes" to the liability question (Question 1), the jury determined that Equinor breached the exclusivity provision of Section 4 of the Pipeline Agreement. In other words, the jury found that Equinor did not honor the agreement to purchase from Lindale all the water needed for its wells on the pipeline for drilling, completion, and production. Thus, Lindale failed to receive the benefit of its bargain because it lost the opportunity to be compensated in accordance with the Pipeline Agreement for water that it did not supply to Equinor for drilling and completion of some wells.[7] Thus, Lindale's lost benefit of the bargain was the loss of its profits for supplying water to Equinor's wells when Equinor used other water providers, as calculated based on the Pipeline Agreement. *See Formosa Plastics*, 960 S.W.2d at 50; *B & W Supply*, 305 S.W.3d at 17.

---

[7] Before trial, the trial court limited Lindale's recovery based on limitations to wells that used water from other water providers after June 28, 2015.

### 6. Evidence that supports the damages award

At trial, Howton and Behan testified about the number of Equinor's wells for which Lindale was not the water provider, how much water was used based on Frac Focus, how many days the jobs lasted, and that Lindale would have been able to supply the water at that time. They testified about Lindale's costs, such as labor (including overtime), pumps, the diesel needed to fuel the pumps, and the cost of the diesel, and the cost of the water. They testified that this information could be used to determine Lindale's loss.

A reasonable factfinder could credit all of this evidence, none of which was barred from consideration by rules of law or fact and none of which conclusively established the opposite of the vital facts pertaining to Lindale's losses. *See Suberu*, 216 S.W.3d at 793; *City of Keller*, 168 S.W.3d at 810. Here there was more than a scintilla of evidence to support the jury's verdict, and, therefore, the evidence was legally sufficient. *See Suberu*, 216 S.W.3d at 793.

### 7. Distinguishing *Bankcard Processing*

Equinor urges us to conclude that the evidence is legally insufficient here for the same reasons we found the evidence legally insufficient in *Bankcard Processing, Int'l, LLC v. United Business Services, LP*, in which we held the evidence of damages was legally insufficient when the jury charge asked for the loss in value of a business (UBS, LP) due to the dissolution of a nascent joint

31

venture between the plaintiff and defendant. *Bankcard Processing Int'l, LLC v. United Bus. Servs., L.P.*, No. 01-10-01079-CV, 2012 WL 3776024, at *5–6 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, pet. denied) (mem. op.). In that case, the jury instruction required a comparison of the plaintiff's business after the defendant failed to follow through with a nascent joint venture with the value of the business in the absence of the breach of agreement. *Id.* at *5.

We explained that the expert witness's lost profits analysis depended on a conclusion that the value of the plaintiff's business was zero after the breach. *Id.* Such a conclusion had no support in the evidence because the plaintiff's business, as opposed to the intended joint venture, was an ongoing business concern. *Id.* Reading the jury instruction more "natural[ly]," we concluded that jury was asked to consider the value of the plaintiff's business itself, not the "mere expectation of profits from a new business opportunity, projected over a fixed period of time." *Id.* But the expert witness had repeatedly testified that he was never asked to establish a value for UBS, LP and never did so. *Id.* And we concluded that a reasonable factfinder could not have disregarded this testimony. *Id.* *5.

This case is different from *Bankcard Processing*. Here, the jury instruction set forth the benefit of the bargain based on the parties' agreement. In this case Lindale's loss of profits was a material and probable consequence of Equinor's breach. The Pipeline Agreement required Equinor to purchase water from Lindale

for drilling and completion of the wells in question unless Lindale could not provide the water. Legally sufficient evidence showed that Lindale could have provided the water, and other legally sufficient evidence provided the data and objective factual basis for determining the amount of Lindale's damages.

We hold that the evidence was legally sufficient to support the jury's verdict and the trial court's judgment. We overrule Equinor's second issue.

## Conclusion

We grant Lindale's pending motion to voluntarily dismiss its cross-appeal. *See* TEX. R. APP. P. 42.1(a); 43.2(f). We affirm the judgment of the trial court.


Peter Kelly
Justice

Panel consists of Justices Kelly, Landau, and Countiss.